UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SECURITIES and EXCHANGE
COMMISSION,

              Plaintiff,       <u>OPINION</u>

     -against-

                            10 Civ. 1302 (MGC)

GREENSTONE HOLDINGS, INC., HISAO
SAL MIWA, JOHN B. FROHLING, DANIEL
D. STARCZEWSKI, JOE V. OVERCASH,
JR., FRANK J. MORELLI, III, THOMAS
F. PIERSON, III, and JAMES S.
PAINTER, III,

              Defendants,

ACTIVE STEALTH, LLC, BAF
CONSULTING, INC., BLUEWATER
EXECUTIVE CAPITAL, LLC, EMERGING
MARKETS CONSULTING, LLC, KCS
REFERRAL SERVICES, LLC, MBA
INVESTORS, LTD., POWER NETWORK,
INC., PROJECT DEVELOPMENT, INC.,
SEVILLE CONSULTING, INC., STARR
CONSULTING, INC., TUSCANY
CONSULTING, INC., and YT2K, INC.

         Relief Defendants.

----------------------------------X

APPEARANCES:

        U.S. SECURITIES and EXCHANGE COMMISSION
        3 World Financial Center, Room 400
        New York, NY 10281

        By:  Jack Kaufman, Esq.
            Alexander Janghorbani, Esq.

        HISAO SAL MIWA and JOHN B. FROHLING
        Defendants Pro Se

**Cedarbaum, J.**

Section 5 of the Securities Act of 1933 makes unlawful the public sale of unregistered securities.  15 U.S.C. § 77e.  At one time, Rule 144(k) exempted securities from registration before public sale if the securities were issued privately, solely in exchange for restricted securities of the same company if the restricted securities were more than two years old.  17 C.F.R. § 230.144(k).  The Securities and Exchange Commission ("SEC") now moves for summary judgment against Hisao Sal Miwa, the CEO of Greenstone Holdings, Inc. ("Greenstone"), and John Frohling, Greenstone's general counsel, for violating Section 5 by causing Greenstone to issue more than 300 million unregistered shares of stock.  The SEC also moves for summary judgment on the securities fraud charges brought against both defendants.  The SEC charges that, from 2006 through 2008, Frohling wrote several legal opinions that falsely stated that stock issued by Greenstone was exempt from registration under Rule 144(k), in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).  The SEC also charges Miwa with violating Sections 10(b) and 17(a) by issuing press releases that falsely described Greenstone's business as thriving.

In defense, Frohling argues that the SEC is unable to prove the intention to defraud required by Section 10(b). Miwa argues that he was not responsible for the press releases and that the press releases were not false. On October 20, 2011, I held oral argument on the SEC's motion. At oral argument, both Frohling and Miwa were given leave to submit admissible evidence in response to the SEC's Rule 56.1 statement. Frohling and Miwa have been unable to raise any genuine dispute of material fact with respect to the allegations of the complaint. For the reasons that follow, the motion of the SEC is granted.

## I.   Frohling's § 10(b) and § 17(a) Liability

### A. Background

Miwa incorporated Greenstone in Delaware in 2004. Greenstone developed several chemical products, including a chemical called GreenShield. Greenstone advertised GreenShield as an environmentally safe wood sealant for use primarily by construction and railroad companies. In December 2005, with Greenstone facing a severe liquidity crisis, Miwa arranged to convert Greenstone into a publicly traded company. Greenstone acquired the shares of a public shell company--Auto Centrix, Inc.--and changed the company's name to Greenstone. Miwa took over as CEO of the new Greenstone public corporation in January 2006.

Greenstone then hired Corporate Stock Transfer, Inc. ("CST") to serve as its stock transfer agent and issue stock certificates.  From September 2006 through June 2008, until the SEC suspended the trading of Greenstone stock, Greenstone distributed millions of shares of unregistered stock to the public.  In order to sell Greenstone shares to the public, Frohling took steps to create the false appearance that the Greenstone stock issuances complied with the limited registration exemption then provided by Rule 144(k) of the Securities Act.  The SEC alleges that, as counsel for Greenstone, Frohling wrote or concurred in at least ten legal opinions that falsely stated facts which, if true, would have supported an exemption from registration under Rule 144(k) for the public sale of Greenstone stock.

Rule 144 has been amended,[1] but the Second Circuit has described its operation during the relevant time period as follows:

> Rule 144 generally affects only "restricted securities," or those securities that have never been publicly sold.  To comply with Rule 144, a person ordinarily must meet numerous requirements concerning public information, holding periods, number of shares, manner of sales, and notice to the Commission. However, under subsection (k) of the Rule, if a person is not now and has not been an affiliate of the issuer within the last three months, and at least two years

---

[1] In February 2008, Subsection 144(k) was eliminated and substantively similar provisions were added to other parts of the rule. Revisions to Rules 144 and 145, 72 F.R. 71546-01.

> have elapsed since the securities to be sold were last acquired from an issuer or affiliate of the issuer, then that person need not comply with the other Rule 144 requirements.

SEC v. Kern, 425 F.3d 143, 148 (2d Cir. 2005); see also 17 C.F.R. § 230.144(k). The two-year ownership requirement is satisfied if the securities were acquired for "consideration consisting solely of other securities of the same issuer surrendered for conversion." 17 C.F.R. § 230.144(d)(3)(ii). In that event, the securities would be deemed to have been acquired at the same time as the securities surrendered for conversion. Id.

As noted above, Rule 144(k) applied only to "restricted securities." 17 C.F.R. § 230.144(k). The term "restricted securities" was, in relevant part, defined as "securities acquired directly or indirectly from an issuer in a transaction or chain of transactions not involving any public offering." 17 C.F.R. § 230.144(a)(3)(i). To determine whether stock was acquired in the course of a "public offering," courts consider: (1) the number of offerees; (2) the sophistication and experience of the offerees; (3) the nature and kind of information which has been provided; and (4) the size of the offering and the precautions taken to prevent the offerees from reselling their securities. Steed Finance LDC v. Nomura Sec.

<u>Int'l, Inc.</u>, No. 00 CIV. 8058(NRB), 2001 WL 1111508, at *5 (S.D.N.Y. Sept. 20, 2001).

## B. Frohling's Legal Opinions

The following facts are undisputed:

### 1. Martin & Pritchett Opinions at the Time of the Merger

In order to carry out the merger between Greenstone and Auto Centrix, several of Frohling's and Miwa's co-defendants (who will be referred to for the purposes of this opinion as "the Morelli Group") purchased the Auto Centrix shell corporation.  The Morelli Group paid Greenstone $355,000 in exchange for 12.3 million unregistered shares of Greenstone stock.  The shares were to be slowly resold on the open market according to the terms of a "Leak-Out Agreement" between Greenstone and the Morelli Group.  Roughly one-third of the shares, or the proceeds from their sale, were to be used to pay certain of Greenstone's expenses, such as broker and attorney fees and public and investor relations.

Miwa wrote a letter to Greenstone's transfer agent, CST, on August 29, 2006, authorizing CST to issue 12.3 million unregistered shares.  In order for the shares to be sold to the public, Miwa promised "an approving legal opinion of our Securities Counsel, Frohling & Hudak LLC."  On the same day, Frohling wrote a letter to CST "approving the two opinions of [the law firm] Martin & Pritchett," and directing CST to

transfer the shares to a number of entities controlled by the
Morelli Group.  On August 31, 2006, Frohling wrote another
letter to CST to clarify that "[t]he shares referred to in our
[prior] opinion letter . . . may be issued without restriction
and the Transfer Agent also will not be required to affix a
legend[2] to the shares or to make any notation on the transfer
records regarding the sale of any of these shares."  Based upon
the belief that (1) Greenstone intended to issue the stock
solely in exchange for old Auto Centrix "convertible promissory
notes," and (2) the issue did not involve a public offering, the
Martin & Pritchett opinions concluded that the shares "will be
exempt from the registration and prospectus delivery
requirements of the [Securities] Act, pursuant to the exemption
set forth in Rule 144(k)."  CST issued the 12.3 million shares
according to Frohling and Miwa's instructions.

     The information relied upon by Martin & Pritchett, and
adopted and approved by Frohling, was false.  Greenstone
received ample new consideration in exchange for issuing the
shares.  As noted above, the Morelli Group paid Greenstone
$355,000 as consideration for the 12.3 million shares and agreed
to use a portion of the shares to pay for Greenstone's various
operating and marketing expenses.  Second, the stock issued to

---

[2] A restrictive legend is placed on unregistered stock
certificates to indicate that the shares are not to be sold to
the public.

the Morelli Group was explicitly subject to a "leak out" agreement that allowed the purchasers to sell the stock to the public gradually over the subsequent eighteen months. Further, the 12 million shares represented roughly 95% of Greenstone's tradable shares at the time. The sale therefore could not satisfy the requirement for Rule 144(k) exemption that it be non-public. The Martin & Pritchett opinions, approved by Frohling, claimed a registration exemption under Rule 144(k) that did not apply.

**2. Sourlis Opinion of February 2007**

On February 1, 2007, Miwa again authorized CST to issue unrestricted, unregistered stock to the Morelli Group. This time, he authorized the issuance of 11,056,498 shares. On the same day, Frohling submitted to CST legal opinions written by attorney and co-defendant Virginia Sourlis. Frohling added that he concurred in the Sourlis opinion and requested that CST issue 6,150,000 shares[3] of Greenstone stock to four entities owned by individuals in the Morelli Group.

Once again, the legal opinions submitted by Frohling improperly relied on the Rule 144(k) registration exemption. The Sourlis opinion stated that the exemption applied because the shares were to be issued in exchange for the surrender of

---

[3] The remaining roughly 5 million shares were issued by CST pursuant to an opinion written by Thomas Pierson. That opinion is not at issue here.

$77,339.65 worth of convertible promissory notes that had been issued by Greenstone's predecessor corporation, Auto Centrix, "on or before January 10, 2004."  These convertible notes were issued by Auto Centrix to "various vendors" and the notes were assigned to the entities owned by the Morelli Group on January 10, 2006.  Sourlis reasoned that the shares could be issued without a restrictive legend because they were to be exchanged solely for outstanding two-year-old Greenstone securities surrendered for conversion.  Thus, they need not be held by the Morelli Group entities for two years under the exemption in Rule 144(d)(3)(ii).  CST relied on Sourlis's opinion letter and Frohling's concurrence and issued the requested shares without a restrictive legend.

In fact, no such convertible notes even existed.  Sourlis submitted along with her opinion a list of Auto Centrix's "aged payables"--debts that the company owed to vendors such as American Express, Verizon, and FedEx.  According to Sourlis, "the Original Convertible Notes were issued by the Company to various vendors" on the list as payment for Auto Centrix's debts.  This was false.  Co-defendant Thomas Pierson testified at his deposition that any statement that such notes were issued is "erroneous."  Moreover, declarations from seven of the vendors listed by Sourlis, including American Express and

Verizon, state that they never received notes of any kind.[4]  This evidence directly contradicts statements in the Sourlis opinion that Sourlis received verification from the noteholders that, for example, no additional consideration was received in exchange for the notes.  Given that the notes did not exist, the statement in the Sourlis opinion that "the Original Convertible Notes were assigned and endorsed" was false as well.[5]  As discussed above, Frohling adopted Sourlis's statement in full when directing CST to issue additional stock even though he knew the true facts.  Frohling again adopted a legal opinion that claimed for Greenstone stock a registration exemption under Rule 144(k) that he knew did not apply.

### 3. Additional Frohling Opinions, 2007–2008

Between August 2007 and February 2008, Greenstone engaged in a series of eight additional unregistered stock offerings. In each instance, Frohling issued a legal opinion invoking Rule 144(k) so that the unregistered shares could be issued without a

---

[4] One promissory note was indeed produced by an eighth vendor, but the face of the document reveals that the note is not convertible.

[5] The SEC also argues that even if the convertible notes did exist, they would not constitute securities within the meaning of Rule 144(k) because they "merely formalized various accounts payable of Auto Centrix incurred in the ordinary course of business."  See Reves v. Ernst & Young, 494 U.S. 56, 65–66 (1990) (holding that "a note which merely formalizes an open-account debt incurred in the ordinary course of business" is not a security).

restrictive legend.  The Rule was invoked on the grounds that the stock was to be issued (1) non-publicly, and (2) in exchange for the cancellation of part of a note that had been created in June 2005 to convert current obligations to long term debt.[6]  CST issued the requested number of unregistered shares pursuant to Miwa's authorization and Frohling's justification.  Six of the eight offerings totaled over 300 million new unregistered shares of Greenstone stock.  Prior to August 2007, Greenstone had only 13,351,182 shares of stock outstanding.

In fact, however, the stock in question was ineligible for the Rule 144(k) exemption because the stock was issued to entities controlled by individuals in the Morelli Group for either new or improper consideration.  Miwa had reached an agreement with members of the Morelli Group that Greenstone would issue shares to them in exchange for roughly half of the proceeds they received from the subsequent sale of the stock to the public.  Further, the Morelli Group agreed to use a portion of the proceeds from the sale of the shares to hire investor and public relations firms to promote Greenstone's business.  The

---

[6] For the final two offerings in this time period, Frohling's legal opinion actually claimed a registration exemption pursuant to "Rule 504 of the Securities Act of 1933."  It is undisputed that this exemption does not apply.  Frohling testified at his deposition that use of Rule 504 was "probably" a mistake.  On June 12, 2008, after the shares were issued, Frohling wrote a letter to a broker-dealer clarifying that the shares issued pursuant to the final two opinions relied on the same factual bases for the Rule 144(k) registration exemption.

substance of these agreements was discussed in a series of
letters among Miwa, Frohling, and the Morelli Group sent between
August 2007 and February 2008.

The very nature of the agreement between Miwa and the
Morelli Group belied Frohling's assertion that the stock was not
issued to the public.  Members of the Morelli Group never
intended to hold the newly-issued shares.  Rather, Miwa,
Frohling, and the Morelli Group understood that the shares were
to be sold immediately to the general public so that a portion
of the proceeds could be returned to Greenstone.  The fact that
the Morelli Group acted as a go-between does not change the
reality that Greenstone planned to raise money by selling its
shares to the public.  Rule 144(k) could not have served as a
legal basis for exempting these 300 million shares from
registration.

Frohling issued legal opinions for two final distributions
of unregistered Greenstone stock.  In October 2007 and April
2008, Greenstone distributed a total of 11.5 million shares of
its stock to Frohling himself.  For each transaction, Frohling
wrote a legal opinion stating that the shares were exempt from
registration under Rule 144(k) because they were issued in
exchange for a promissory note purportedly owned by Frohling
concerning "obligations" that arose in the prior year.  CST
issued the shares in both instances.

Rule 144(k) did not authorize these transactions.  First, the obligations covered by the promissory notes (fees for Frohling's legal services) arose only one year prior, not two as required by Rule 144(d)(3)(ii).  Second, Reves excludes from the definition of "security" formalized open-account debts such as the ones relied upon by Frohling.  See 494 U.S. at 65-66; supra note 5.  Third, Rule 144 was amended on February 14, 2008, to eliminate subsection k.  Thus, contrary to Frohling's opinion letters to CST, the shares issued to Frohling could not have been exempt from registration under Rule 144(k).

## C. Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists when the evidence is such that a reasonable finder of fact could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In deciding whether a genuine dispute exists, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

## D. Anti-Fraud Securities Law

"To have violated Section 10(b) and Rule 10b-5, [the defendants] must have: (1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). Essentially the same elements are required to prove a violation of Section 17(a), except the misrepresentation must have been made in connection with the "offer or sale" of a security. Id. "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Capital Group, Inc. v. First Derivative Traders, --- U.S. ---, 131 S. Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011).

A false statement or an omitted fact is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" Basic Inc. v. Levinson, 485 U.S. 224, 231 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)). To fulfill the materiality requirement, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Id.

(quoting ISC Indus., 426 U.S. at 449).  The fact that a
statement is made in private -- for example, to a transfer agent
-- rather than to the public does not foreclose a statement's
materiality.  SEC v. Czarnik, No. 10 Civ. 745(PKC), 2010 WL
4860678, at *5 (S.D.N.Y. Nov. 29, 2010) (citing United States v.
Naftalin, 441 U.S. 768, 776, 99 S. Ct. 2077, 60 L. Ed. 2d 624
(1979)).  "Insofar as [an] attorney's opinion letter and other
documents necessarily inform the transfer agent's decision,
misrepresentations in such documents may be considered important
by the reasonable investor."  Id.

Because Section 10(b) must be read "flexibly, not
technically and restrictively," Superintendent of Ins. v.
Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30
L.Ed.2d 128 (1971), the "in connection with" element has been
interpreted to mean that the plaintiff need only show that "a
security buyer or seller suffer[ed] an injury as a result of
deceptive practices 'touching' its purchase or sale of
securities."  In re Ames Dept. Stores Inc. Stock Litig., 991
F.2d 953, 964 (2d Cir. 1993) (citing Superintendent of Ins., 404
U.S. at 12-13).

"Scienter, as used in connection with the securities fraud
statutes, means intent to deceive, manipulate, or defraud, or at
least knowing misconduct."  SEC v. First Jersey Sec., Inc., 101
F.3d 1450, 1467 (2d Cir. 1996).  "In order to show scienter, the

15

SEC must demonstrate either that the defendant had actual knowledge of material facts that were omitted or distorted or failed or refused to ascertain and thereafter accurately disclose such facts after having been put on notice as to their possible existence." SEC v. Wellshire Sec., Inc., 773 F. Supp. 569, 576 (S.D.N.Y. 1991); see also SEC v. U.S. Envt'l, Inc., 155 F.3d 107, 111 (2d Cir. 1998) (collecting cases).

"In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud . . . ." ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.2d 187, 198 (2d Cir. 2009).  Recklessness is defined as, "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)) (alterations in original, internal quotation marks omitted).

### E. Liability

As explained in detail above, the Martin & Pritchett and Sourlis opinions that Frohling concurred in, as well as the opinions written and sent to the transfer agent by Frohling

himself, all falsely claimed registration exemptions under Rule 144(k).  Frohling argues in his opposition papers that he did not know at the time nor does he believe now that any of the opinions were false.  He supports this claim with citations to his deposition testimony, which is somewhat consistent.  At his deposition, Frohling testified that he had no knowledge that the proceeds from the sale of the 300 million shares would be remitted to Greenstone, nor was he aware that all, as opposed to some, of the recipients of the shares would be selling them.  He further stated that he had no knowledge that any of the Morelli Group-owned entities were acting in concert.

Frohling's claim is flatly contradicted by the evidence. First, as to the letters Frohling wrote, the record contains numerous e-mails sent by Miwa to Frohling in which Miwa discusses the Morelli Group's plan to sell shares to the public and remit the proceeds to Greenstone.  Miwa explicitly states that portions of the shares were to be used for "funding the company," that is, in exchange for new consideration. Furthermore, Frohling admitted at his deposition that he knew of the Morelli Group's commitment to transfer to Greenstone at least half of the proceeds of the public sale of the unregistered shares.  Thus, he knew that the shares were being improperly sold for new consideration.  Second, Frohling presents no evidence to contradict the fact that the purported

promissory notes that he allegedly exchanged in return for the shares issued to him were only one year old instead of the two required by statute.  Third, Frohling offers no rebuttal to the proof submitted by the SEC that the convertible notes owned by Greenstone's vendors not only were not convertible, but did not even exist.  Moreover, open-account debts cannot be converted to securities simply by issuing notes.  See Reves, 494 U.S. at 65–66.

Even if Frohling had no actual knowledge of the opinions' falsity at the time he wrote or concurred in them, Frohling is liable for securities fraud.  The D.C. Circuit has outlined the responsibilities of an attorney issuing a legal opinion:

> Under the securities laws, a statement of opinion includes an implied representation that the speaker rendered the opinion in good faith and with a reasonable basis.  Good faith alone is not enough.  An opinion must have a reasonable basis, and there can be no reasonable basis for an opinion without a reasonable investigation into the facts underlying the opinion.  [The defendant] thus implicitly represented that he had conducted "a reasonably sufficient examination of material legal and factual sources and [had] reasonable certainty as to the subjects addressed therein."

Weiss v. SEC, 468 F.3d 849, 855 (D.C. Cir. 2006) (citations omitted).  Weiss has not been cited in this Circuit but the Second Circuit has similarly explained that "a lawyer, no more than others, can[not] escape liability for fraud by closing his eyes to what he saw and could readily understand."  SEC v.

18

_Frank_, 388 F.2d 486 (2d Cir. 1968); see also _United States v._
_Benjamin_, 328 F.2d 854, 861 (2d Cir. 1964) (discussing
accountants); _SEC v. Price Waterhouse_, 797 F. Supp. 1217, 1240
(S.D.N.Y. 1992) (discussing auditors).

Frohling appears not to have investigated the truth of the
statements he signed.  Each statement blatantly misstated the
facts concerning the issuance of the unregistered stock.  As
counsel for Greenstone, Frohling had access to all relevant
documents.  For example, it would not have been difficult for
Frohling to ascertain that no convertible notes were ever issued
to vendors of Auto Centrix as claimed in the Sourlis opinion.
Likewise, Frohing appears to have conducted no real review of
the applicable law.  Frohling's last opinion letter, for
example, claimed a Rule 144(k) exemption after Rule 144(k) was
eliminated by amendment.  Frohling seeks to avoid liability for
writing a false opinion by stating that he later cancelled the
issuance of these shares and that none were ever sold.  He
provides no documentary evidence to support this claim.  The
undisputed facts show that Frohling received 10 million
Greenstone shares as a result of this opinion letter and shortly
thereafter sold at least 2.9 million of those shares.

Frohling's avoidance of the true facts was reckless at
best.  There is no question that his legal opinions were

material misstatements and were made "in connection with" an offering of securities.

## II.  Miwa's § 10(b) and § 17(a) Liability

### A. The Press Releases

The SEC seeks to hold Miwa liable for violating sections 10(b) and 17(a) by drafting a series of press releases during 2007 and 2008.  Throughout this period, Miwa served as either the CEO or COO of Greenstone.  As part of his duties in both positions, Miwa was responsible for Greenstone's day-to-day business operations and for drafting the company's press releases.  Greenstone was under significant financial stress during this period, and Miwa routinely loaned Greenstone his own money just to keep the company afloat.  Despite Greenstone's financial difficulties, Miwa issued several press releases that falsely portrayed Greenstone as selling significant quantities of GreenShield when, in fact, it was not.

The SEC alleges that seven press releases drafted by Miwa violated anti-fraud provisions of the securities laws.  The Greenstone press releases are summarized briefly:

1. ECORail Press Release, February 27, 2007: Greenstone announced that it had "received an initial order of 500 gallons of the Company's railroad tie treatment chemical from ECORail Products, Inc."  In fact, Greenstone did not have the financial capacity to produce such a quantity of

GreenShield.  Greenstone never delivered 500 gallons of
GreenShield to ECORail.

2. ECORail Press Release, May 27, 2007: Greenstone announced
   that its "exclusive railroad industry license partner,"
   ECORail, "produces environmentally friendly composite wood
   railroad track materials using Greenstone's proprietary
   process Green X."  Miwa admitted in his deposition that
   ECORail was not producing any railroad ties using
   Greenstone products at the time of this release.

3. ECORail Press Release, February 20, 2008: One year after
   its first misleading press release, Greenstone announced
   that it had "received an instruction to deliver GreenShield
   . . . to [ECORail] . . . .  In 2007 ECORail placed an
   initial order for 500 gallons, but the delivery of the
   product had been on hold because of ECORail's continuing
   product testing and market development for its
   environmentally safe products used by the railroad
   industry."  This release created the misleading impression
   that delivery was to be for the full 500-gallon initial
   order when, in fact, Miwa knew that delivery was for, at
   most, 55 gallons.

4. Bay Tree Press Release, March 6, 2007: Greenstone announced
   that it "received an initial order of 1000 gallons of

GreenShield . . . from Bay Tree Technologies . . . ."
Further, it stated that "Bay Tree's treatment facility is
expected to be in production in approximately one month"
and that "this is the third order for GreenShield™ received
this month indicating the market acceptance of this project
is growing." As explained above, however, Miwa knew that
Greenstone did not have the capability to fulfill such an
order at that time. Furthermore, the order from Bay Tree
was conditioned upon another company's performance and
could be cancelled at Bay Tree's discretion. Miwa admitted
at his deposition that the press release was intended to
help Greenstone obtain financing from investors.

5. Field Test Press Release, December 20, 2007: Greenstone
   announced the successful results of a field test it had
   conducted with GreenShield on a house located in Colorado.
   The release failed to disclose that the owner of the house
   was Frank Morelli, who owned shares in Greenstone, and that
   Morelli himself reported the results without any
   application of a scientific method.

6. D&L Press Release, March 19, 2008: Greenstone announced
   that it had settled litigation with a company called D&L
   and "the Investor of a patent and two patent applications."
   It further stated that "no significant cash payments were

required of Greenstone other than future royalties" and that Greenstone was "joining forces with D&L" on a new project involving its products.  In fact, Greenstone owed nearly $15,000 as a result of the settlement at a time it had nearly no cash on hand, and no collaboration between Greenstone and D&L ever took place.

7. Train Travel Press Release, April 30, 2008: Greenstone announced that it had "received the first order from Train Travel, Inc. for Permeate™ HS200 anti-corrosion paint and also MagneLine® polymer cement mortar to restore three historic 1917 rail cars to protect them from weathering and maintaining the original look for years afterwards."  In fact, there was no such order.  Train Travel lacked the financial ability to purchase products from Greenstone and, at best, would purchase a test quantity of each to see if they worked.  Miwa admitted that he issued the press release "to show there's an application for Permeate."

**B. Liability**

Miwa raises no genuine dispute of material fact as to either the falsity of these press releases or his responsibility for their drafting.  Miwa argues first that he was not the Greenstone executive responsible for the content of the press releases.  He claims in his memorandum of law and his response

to the SEC's Rule 56.1 statement that, during the time when he
served as Greenstone's COO and Michael Ferrone served as the
CEO, it was Ferrone who had ultimate authority over the issuance
of press releases.  Miwa also contends that any work he
performed relating to the press releases was done at Ferrone's
direction.  This assertion is contradicted by the evidence.  At
his deposition, Miwa did not deny that he was responsible for
"everything" at Greenstone, and that his responsibility for the
press releases continued even while Ferrone was CEO.  Miwa has
not denied that he drafted the releases.  There is no genuine
dispute that Miwa was the "maker" of the statements under <u>Janus</u>,
131 S. Ct. at 2302.

Miwa also argues that some of the releases were not, in
fact, misleading.  For example, Miwa asserts that Greenstone did
have the financial wherewithal to fulfill the order placed by
Bay Tree.  He claims that he was personally funding Greenstone
at the rate of $20,000 per month, which would have more than
covered the cost of producing the amount of GreenShield stated
in the release.  According to Greenstone's financial statements,
however, the company was quickly losing money and had very
little cash in reserve.  Even if Miwa's account of Greenstone's
finances is accurate, e-mails between Bay Tree and Greenstone
show that the order referred to in the press release was
conditioned upon Bay Tree's obtaining financing and could be

cancelled by Bay Tree at any time.  Moreover, Miwa admitted in pre-trial testimony that he knew that the press releases were materially false or misleading, as he knew of facts that contradicted them.  He cannot now offer affidavits to contradict his prior sworn testimony in an effort to defeat summary judgment.  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

Regarding the April 2008 Train Travel Press Release, Miwa submits a declaration from Train Travel, Inc.'s President and CEO Allen Brown in which Brown claims that the press release was not false because Train Travel had "full intention of paying for the order."  Regardless of Brown's intention, Miwa's deposition testimony shows that there was no contract between Train Travel and Greenstone, no invoice for any purchase or delivery, and that Greenstone was capable of providing Train Travel with only a quarter of a gallon of Permeate, far less than would be required to restore three rail cars.  Thus, there is no genuine dispute that the press release contained false statements.

The false statements were material to potential investors because they concerned the sale of Greenstone products in significant quantities, the settlement of a patent lawsuit, and the results of a field test of Greenstone products.  A reasonable investor would find these topics material in deciding whether or not to invest in Greenstone.  See id.  Miwa disputes

25

the materiality of the February 20, 2008 press release that
created the misleading impression that Greenstone was delivering
500 gallons of GreenShield to ECORail.  Miwa asserts that even
if there had been a full delivery of 500 gallons, such a small
purchase is so insignificant to the overall financial health of
Greenstone that the actual size of the delivery would be
irrelevant to a potential investor.  His assertion is belied by
the very fact that he found it significant enough to issue a
press release.  Furthermore, Miwa admitted in his deposition
that the purpose of several of the press releases was to attempt
to increase investor interest in the company.  Evidence in the
record shows that at least one Greenstone investor sent an
e-mail to ECORail inquiring about the February 20, 2008 press
release, additional proof of the statement's materiality.

Miwa also maintains that the failure of the December 20,
2007 Field Test Press Release to disclose that the test was
conducted on the home of Frank Morelli was not material because
Morelli did not own any Greenstone shares at that time.  It is
undisputed, however, that Morelli did have a financial stake in
the success of the company.  As he stated in his pre-trial
testimony, Morelli was the "point man" of the group that
invested in Greenstone stock, he arranged for his Greenstone
shares to be assigned to his wife and daughter, and he fully

expected to be financially rewarded for his work in putting
together the investment group.

Regarding the element of scienter, Miwa argues that even if
the press releases were false or misleading, he had no knowledge
of any material facts that were omitted or distorted in the
press releases.  For example, with respect to the February 27,
2007 ECORail Press Release, Miwa states that he was unaware that
ECORail lacked the financial wherewithal to produce the railroad
ties referred to in the press release.  In support, he submits a
declaration from ECORail President and CEO Allan Brown in which
Brown states that he did not disclose to Miwa the problems with
ECORail's financing.  This assertion is contradicted by Miwa's
pre-trial testimony in which he admitted that, at the time he
issued the press release, he was aware that ECORail lacked the
financing to fund the transaction and had only the "potential of
getting money in" to complete the deal.  Miwa was certainly
aware of Greenstone's inability to supply the product.  In his
deposition, he admitted that the company did not have the
financing in place to deliver on ECORail's order.  Miwa also
contends that his conduct in writing false and misleading press
releases did not represent an extreme departure from the
standards of ordinary care because each press release was
reviewed and edited by advisors, board members, and general
counsel.  Miwa knew that the statements he wrote and distributed

to investors were false and misleading and, as the "maker" of the statements, he is liable.

Finally, the Second Circuit has interpreted the "in connection with" requirement broadly for cases involving false or misleading press releases:

> [W]e hold that Rule 10b-5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media, if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes.

SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 861-62 (2d Cir. 1968) (en banc). Miwa admitted in his deposition testimony that the press releases were intended to influence the investing public. He raises no genuine issue of material fact in his opposition papers.

## III. Non-Fraud Claims for Improper Stock Issuances

Between August 2006 and June 2008, pursuant to the legal opinions provided by Frohling and the authorizations from Miwa, Greenstone issued unregistered stock for sale to the public on at least thirteen separate occasions totaling over 300 million unrestricted shares. The SEC argues that there is no genuine issue of material fact that both Miwa and Frohling were responsible for the issuance of the stock, and, for the reasons discussed above, the unregistered stock was unlawfully issued

28

without a restrictive legend.  Thus, they argue that summary
judgment should be granted as to Miwa and Frohling's liability
under Section 5 of the Securities Act.

In order to prove a Section 5 violation, the SEC must show
that: (1) the defendant directly or indirectly offered to sell
securities; (2) no registration statement was in effect for the
offered securities; and (3) interstate means were used in
connection with the offer or sale.  Europe & Overseas Commodity
Traders, S.A. v. Banque Paribas London, 149 F.3d 118, 124 n.4
(2d Cir. 1998).  A person not directly engaged in the transfer
of the title of a security can be held liable if he has "engaged
in steps necessary to the distribution of [unregistered]
security issues."  SEC v. Chinese Consol. Benevolent Ass'n,
Inc., 120 F.2d 738, 741 (2d Cir. 1941).  The participation must
be substantial, not de minimis.  SEC v. Universal Express, Inc.,
No. 04 Civ. 2322 (GEL), 2007 WL 2469452, at *4 n.3 (S.D.N.Y.
Aug. 31, 2007) (citations omitted).  Scienter need not be
proven.  SEC v. Universal Express, Inc., 475 F. Supp. 2d 412,
422 (S.D.N.Y. 2007).

There is no genuine issue of material fact regarding the
liability of either Frohling or Miwa under Section 5.  The
second and third elements of Section 5 liability are not
disputed.  As to the first element, neither defendant disputes
his involvement in Greenstone's issuance of stock.  As CEO and

COO, Miwa authorized and directed CST to issue the unregistered Greenstone stock.  CST would not have issued the unregistered shares without Miwa's written authorization.  See Universal Express, 475 F. Supp. 2d, at 424.  As general counsel, Frohling wrote and approved opinion letters without which CST would not have issued any unregistered shares.  Such conduct is sufficient to hold an attorney liable under Section 5.  See Czarnik, 2010 WL 4860678, at *12.

## CONCLUSION

For the foregoing reasons, the motion of the SEC for summary judgment is granted as against Frohling and Miwa for violating Sections 5 and 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934.


SO ORDERED.

Dated:    New York, New York
          March 28, 2012


                              S/_____

                                 MIRIAM GOLDMAN CEDARBAUM
                                 United States District Judge